IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Kevin Gray, | : | |
| | : | Case No. 1:16-cv-999 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting in Part and Denying in |
| Jasen Hatfield, *et al.*, | : | Part Defendants' Motion for Summary |
| | : | Judgment |
| Defendants. | : | |
| | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 36),
to which Plaintiff responded in opposition (Doc. 39) and Defendants replied (Doc. 41). For the
reasons that follow, Defendants' Motion will be **GRANTED IN PART AND DENIED IN
PART.**

I.      **BACKGROUND**[1]

A.      **Facts**

This 42 U.S.C. § 1983 civil rights action arises from a late-night police stop of a driver on
purported reasonable suspicion of drunk driving. Because the accounts of the stop and
subsequent arrest vary, the Court will begin with the officers' version of events and next turn to
Plaintiff's version.

_____

[1] Except as otherwise indicated, background facts are drawn from Defendants' Proposed Undisputed Facts (Doc. 36-1) to the extent those facts are admitted in Plaintiff's response thereto (Doc. 39-1). Where the parties do not explicitly agree on any statement of fact, the Court cites to the portion of the record providing support for the statement.

1. **Events of December 12, 2014**

   a. **Account of Deputy Hatfield, Corporal Brockman, and Deputy Brown**

On December 12, 2014, Jasen Hatfield, then a Deputy Sheriff with the Butler County Sheriff's Office, was working third-shift road patrol and traveling north on State Route 128 from the Ross Township area to the City of Hamilton, Ohio. As he approached the intersection of New London Road and State Route 128, he observed Plaintiff Kevin Gray's vehicle make a turn onto State Route 128. (Trial Transcript, Doc. 33-2 at PageID 632 (Hatfield testimony).) State Route 128 is a four-lane highway with a physical divider between the north and south lanes. (*Id.* at PageID 631.)

At state court trial on the subsequent charges, Deputy Hatfield described: "What drew my attention to him with the turn was when he made the turn it was actually a wide turn. He actually turned into the curb lane of State Route 128 and then back into the lane of travel that I was in. It was a very wide, slow turn." (*Id.* at 632.) Deputy Hatfield was "150, 200 yards" away from the car when it was closest to him and had to apply the brakes on his car. (*Id.* at 632–33.) Gray was not traveling at a high rate of speed, and Deputy Hatfield was traveling 50 miles an hour and approaching him quickly, so he had to apply the brakes to avoid rear-ending him. (*Id.* at 633.) The turn was approximately 60 feet away from Major Leagues bar. (Doc. 32-1 at PageID 156.)

Deputy Hatfield proceeded to travel north on State Route 128 two to three car lengths behind Gray's vehicle, and he observed marked lane violations between where Gray turned and the upcoming intersection. (Trial Transcript, Doc. 33-2 at PageID 634.) As they approached the intersection, the light changed from red to green, and once they got through the intersection, he saw more marked violations. (*Id.*) He testified that Gray "was weaving within his lane, having difficulty maintaining his lane" and "[h]is tires on the driver's side actually hit the marked lanes

every once in a while on a couple of occasions actually." (*Id.* at 635.) He saw "four to [f]ive" marked lane offenses that he believes gave him cause to stop Gray. (*Id.*) After these observations, Deputy Hatfield initiated an investigatory stop; Gray eventually pulled over at Zips Auto Body. (*Id.* at 637–38.)

Deputy Hatfield pulled into Zip's Auto Body behind Gray and called in the traffic stop at that time. (*Id.* at 639.) Deputy Hatfield exited his vehicle and approached the driver's side of Gray's car. (*Id.* at 641.) Gray was rolling his window down as he approached. (*Id.* at 644.) Deputy Hatfield observed a strong odor of an alcoholic beverage that was emitting from the inside of the car. (*Id.* at 645.) Gray asked why he was stopped, and in speaking with him, Gray slurred his speech and had glassy, bloodshot eyes. (*Id.* at 646.) When asked for his license, Gray fumbled through his wallet to locate it. (*Id.*)

During this time, Deputy Hatfield noticed the passenger, Christopher Ebbing, was sitting in the passenger seat not wearing a seatbelt. (*Id.*) Hatfield asked him for his license; Ebbing said no, and Deputy Hatfield responded that in order to write him a seatbelt ticket, he needed to know his identity. (*Id.* at 646–47.) Ebbing made a retort along the lines of "go back to your car and write the fucking ticket," and at this time, Deputy Hatfield says his attention was diverted from Gray to Ebbing. (*Id.* at 647.) He approached the passenger side door, opened the door, and asked Ebbing to get out. (*Id.*) Ebbing "indicated" that he wasn't going to step out; at that point, Deputy Hatfield reached in, grabbed Ebbing's right arm to "escort" him out of the car. (*Id.*) Ebbing resisted and pulled away, so Deputy Hatfield pulled harder. (*Id.*) "At that point, he was obstructing my vehicle stop," and Deputy Hatfield felt he had a basis to arrest Ebbing. (*Id.*) He testified that the two "ended up on the ground inside the area where the passenger side door was open and the parking lot. I was on top of Mr. Ebbing. He was struggling, pulling away from me,

resisting. That's when I got on my radio and indicated to dispatch that I had an individual fighting me." (*Id*. at 647–48.)

While he was trying to control Ebbing, Deputy Hatfield observed Gray fidgeting around in between his legs and the center console area of the car, which made him "pretty nervous." (*Id*. at 648.) Once Ebbing was controlled, Deputy Bill Brown of the Butler County Sheriff's Office pulled up, and he got Gray out of his car. (*Id*.) Deputy Hatfield arrested Ebbing for obstructing official business and placed him in the back of his patrol car. (*Id*. at 649.)

Deputy Brown heard Deputy Hatfield call in that he "had one fighting with him," and responded to the call in less than thirty seconds. (*Id*. at 686 (Brown testimony).) He arrived when Deputy Hatfield was on top of Ebbing in the Zips Auto Body parking lot. (*Id.*) As he exited his vehicle, Deputy Hatfield told him that there was still a driver in the car who was moving his hands around and to check on him. (*Id*. at 687.) Gray was positioned with his hands on the steering wheel when Deputy Brown approached the driver's door window. (*Id*. at 688.) Deputy Brown told the driver to step out of the vehicle. (*Id*.) As he stepped out, Deputy Brown noticed a magazine and bullet on the driver's side floorboard by Gray's feet. (*Id*.) Deputy Brown asked, "Kevin, where's the gun?" and Gray responded that it was in the car. (*Id*. at 689.) At that time, Gray was patted down and placed in handcuffs. (*Id*.) Deputy Brown noticed an odor of alcohol coming off of him, as well as mumbled speech. (*Id*. at 692.)

At this time, Corporal Michael Brockman of the Butler County Sheriff's Office was arriving at the scene and he took control of Gray. (*Id*. at 689.) Deputy Brown then conducted a search of the vehicle and located the firearm on the floorboard behind the passenger seat, with the barrel pointed outward toward the passenger. (*Id*. at 689–91.) He also located a holster for the gun under the driver's seat. (*Id*. at 691.)

When Corporal Brockman arrived on the scene, he placed Gray in the back of his vehicle. (*Id*. at 704 (Brockman testimony).)  Corporal Brockman noticed a strong odor of alcohol emitting from the back of his cruiser.  (*Id*.)  Gray kept apologizing for his friend.  (*Id*.)

Deputy Hatfield had a conversation with Gray while he was in the back of Corporal Brockman's vehicle.  (Doc. 33-2 at PageID 649 (Hatfield testimony).)  While he spoke with him, Deputy Hatfield could smell a heavy odor of alcohol coming from him and observed slurred speech and glassy, bloodshot eyes.  (*Id*. at 650.)  Deputy Hatfield asked if he had been drinking that evening, and he said he had "five or six drinks."  (*Id*.)  Gray was placed under arrest at that time based on Deputy Hatfield's observations, the heavy odor of alcohol, and Gray's admission. (*Id*. at 650.)  Deputy Hatfield said it was obvious Gray was intoxicated: "just in speaking with him in the short time that I did.  It doesn't take much common sense to know when someone's intoxicated."  (*Id*. at 650–51.)

Corporal Brockman transported Gray to the Sheriff's headquarters.  (*Id*. at 704–05 (Brockman testimony).)  Once at the jail, Deputy Hatfield read the BMV 2255 form to Gray and asked him to submit to a breathalyzer test.  (*Id.* at 654–56, 673–74 (Hatfield testimony).)  Gray refused the test.

### b.  Account of Plaintiff

On the other hand, Gray's version of events accounts a responsible designated driver helping a drunk friend.  Plaintiff attended a work Christmas party at Dave & Busters in Springdale, Ohio on December 11, 2014, the day before he was arrested.  Gray was at the function from around 3:00 p.m. for about three hours, during which time he consumed three bourbons, appetizers, and a full dinner.  (Gray Dep., Doc. 32-1 at PageID 118, 121, 183–85.)  He went home after the event and went to bed around 10 or 10:30 p.m.  (*Id*. at 185.)  Gray had no

other drinks that evening or in the early morning of December 12 prior to being pulled over by Deputy Hatfield.  (*Id*. at 182.)

Around 2:20 a.m. on December 12, Gray received a phone call from his friend, Ebbing, who was intoxicated and unable to drive himself home from a bar – Major Leagues in Hamilton, Ohio.  (Trial Transcript, Doc. 33-3 at PageID 737–38 (Gray testimony).)  Gray got up, got dressed, and headed out to pick Ebbing up.  (*Id*.)  Major Leagues was closed when Gray arrived, so he waited for Ebbing to exit.  (*Id*. at 739.)  While he was waiting for Ebbing, Gray realized that his gun, for which he had a concealed carry license at that time, was accessible to the passenger.  (*Id*.)  He dropped the magazine from the gun and put the gun behind the passenger side seat, so it was out of reach, and he put the magazine underneath the driver's seat.  (*Id*.)

Leaving the bar, Gray made a right-hand turn, the only way you can leave the bar, onto southbound State Route 128, or Pyramid Hill Boulevard.  (*Id*.)  After about 20 to 30 yards of travel, there is a turn lane north of the concrete island.  (*Id*.)  Gray proceeded into the turn lane, put on his turn signal, and made a left-hand turn into the continuous northbound lane of traffic on State Route 128.  (*Id*.)  Based on the placement of the concrete median, Gray's turn took him into the far lane of travel on northbound State Route 128.  (*Id*. at 740.)  With his turn signal still on, Gray merged back into the left lane of northbound State Route 128 and proceeded to a stop light about sixty yards away.  (*Id*. at 740–41.)  When he made his turn, there was "not another car in sight."  (Gray Dep., Doc. 32-1 at PageID 154.)

Gray came to a complete stop at the traffic light at the intersection of State Route 128 and Pershing Avenue for about eight seconds when he noticed a police car coming up on him at a rapid pace.  (Trial Transcript, Doc. 33-3 at PageID 741 (Gray testimony).)  Once through the intersection, another concrete median separates the north and southbound lanes of traffic.  (*Id. at*

742.)  As Gray drove past the concrete median, Deputy Hatfield activated his overhead lights to initiate a traffic stop.  (*Id*. at 743.)  Gray proceeded to the first available location where he felt safe to stop, Zips Auto Body at the intersection of B Street and Millikin Avenue.  (*Id*.)  Gray pulled into the parking lot, brought the car to a stop, and lowered his window, anticipating Deputy Hatfield to approach his side of the vehicle.  (Gray Dep., Doc. 32-1 at PageID 158; Trial Transcript, Doc. 33-3 at PageID 744 (Gray testimony).)  Deputy Hatfield approached the vehicle on the passenger side.  (Doc. 33-3 at PageID 744 (Gray testimony).)  After Deputy Hatfield asked for Ebbing's identification, Gray leaned over to Deputy Hatfield and informed him that there was a gun in the vehicle.  (*Id*.)  Deputy Hatfield responded by telling Gray to "shut up and keep your fucking hands on the steering wheel."  (Gray Dep., Doc. 32-1 at PageID 159.)  Deputy Hatfield made no other statements to Gray at the scene: he was not asked to produce his license, registration, or insurance, and at no point did Gray admit he had consumed alcohol that evening.  (*Id*. at 174.)

Gray testified that at that point, Gray "ripped my passenger out of [my] vehicle and threw him to the ground."  (Trial Transcript, Doc. 33-3 at PageID 744 (Gray testimony).)  According to Ebbing, Deputy Hatfield approached the vehicle from the passenger side, demanded his identification, and when Ebbing asked what crime he committed, Deputy Hatfield demanded identification again.  (Doc. 32-2 at PageID 267.)  Deputy Hatfield told Ebbing he was not wearing his seatbelt and then pulled him out of the car and jumped on his back.  (*Id*.)

According to Gray, Deputy Brown arrived at the scene, and "[t]he next thing I know, my door is opened, I'm asked to step out of the vehicle, and turn around and place my hands on the – on the vehicle.  At that point in time I was patted down, handcuffed, and sat down behind my vehicle."  (Doc. 33-3 at PageID 745 (Gray testimony).)  Deputy Brown asked Gray where the

gun was as he was getting out of the car. (Gray Dep., Doc. 32-1 at PageID 171.) Gray then sat behind his car for a couple of minutes. (*Id*. at 172.) Corporal Brockman then arrived on the scene. (Doc. 33-2 at PageID 701.) Gray was placed in the back of Corporal Brockman's cruiser. (Trial Transcript, Doc. 33-2 at PageID 701 (Brockman testimony).) Gray did not have a conversation with Deputy Hatfield while in the back of Corporal Brockman's cruiser. (Doc. 33-3 at PageID 744–45.) He never admitted to drinking five or six drinks, and no field sobriety tests were performed on the scene. (*Id*. at 745–46.) Gray was transported to the Butler County Jail and refused a breathalyzer test.

### 2. Gray's Criminal Trial and Corporal Brockman's Dash Camera Footage

Plaintiff was charged with operating a vehicle while under the influence, a first degree misdemeanor, in violation of Ohio Rev. Code § 4511.19(A)(1)(a); improper handling of firearms in a motor vehicle, a fifth degree felony, in violation of Ohio Rev. Code § 2923.16(D)(1); improper handling of firearms in a motor vehicle, a first degree misdemeanor, in violation of Ohio Rev. Code § 2923.16(E)(1); marked lanes, a minor misdemeanor, in violation of Ohio Rev. Code § 4511.33(A); and improper turn, a minor misdemeanor, in violation of Ohio Rev. Code § 4511.36. (Case No. CR2015-01-0041 Butler County Common Pleas Court).

The charges against Gray proceeded to trial in February 2016. (Doc. 33-2 and 33-3.) During discovery prior to trial, Gray's criminal attorney requested videos taken the night of Gray's arrest and was told by the Butler County Sheriff's Office that none existed. (Doc. 1-2 at PageID 23; Doc. 1-3 at PageID 24.) Yet, during trial, Deputy Hatfield testified—in contrast to his prior testimony that none of the incident was preserved because "we don't have videos in our cars"—that Corporal Brockman's camera was equipped with a dash camera, but that he did not believe anything that was captured was "pertinent." (Trial Transcript, Doc. 33-2 at PageID 651

(Hatfield testimony); Suppression Hearing Transcript, Doc. 37-2 at PageID 1098 (Brockman testimony).)  Corporal Brockman later testified that he told Deputy Hatfield that he had a video of the incident and "he passed it on.  I always had it.  It was just a fact of locating it."  (Trial Transcript, Doc. 33-3 at PageID 727.)

As it turns out, Corporal Brockman was issued a camera in 2005, which had been in his cruiser since the car was issued in 2011, and he routinely recorded traffic stops with his camera. (Hatfield Dep., Doc. 32-3 at PageID 385; Doc. 33-2 at PageID 709, 736.)  Deputy Hatfield testified that Corporal Brockman would routinely play cruiser camera videos at the police academy as well as while teaching.  (Hatfield Dep., Doc. 32-3 at 392.)  He would also play the videos in his home.  (*Id*.)

Corporal Brockman routinely recorded traffic stops using his camera, and when the video tapes had gone all the way to the end, he would take them home and store them on a shelf in his basement.  (Doc. 32-4 at PageID 448.)  Although he testified that it "wasn't a secret" he had this camera, Sheriff Jones and Chief Deputy Dwyer claim they were unaware that he had a dash camera in his vehicle.  (*Id.*; Jones Dep., Doc. 32-5 at PageID 502; Dwyer Dep., Doc. 32-8 at PageID 585.)  Corporal Brockman was disciplined regarding his failure to properly store the video.

After the existence of the dash camera was revealed at trial, Corporal Brockman retrieved the video from his home and brought it to court.  (Doc. 33-3 at PageID 722.)  He testified that the computer system in his vehicle requires him to manually input the date and time each time he starts the recorder with his cell phone.  (*Id*. at 722–23.)  He did this on the morning of Gray's arrest.  (*Id*. at 722.)  Corporal Brockman also testified that the relevant segment does not have

audio, because he used the wrong settings that day.  (*Id*. at 723.)  The video was played at trial. (Id. at 725–26.)[2]

The Court has reviewed the dash camera video that has been submitted into evidence in this case.  (Doc. 34.)  It contains three separate video segments.  The first video segment is the relevant segment.  It contains a menu screen where a date and time are shown being entered, 12-11-2014 and 22:48.  The video then cuts to a seconds-long shot of what looks to be a house. That feed contains audio.  The video then cuts to a gray, fuzzy screen, then a gray screen, then to a roadway view of a car driving on a road at a date and time stamp of 12-12-14 and 02:54:23. The Court can hear some noise in the background at a low volume, which sounds like an engine and pulsing or siren sound.  At about 02:56:04 a.m., the Court noticed a siren sound faintly in the background as the cruiser approaches a scene with emergency vehicles.  Most audibly, at about 02:56:26, in pulling into Zips parking lot, the Court hears a siren chirp.  The car then pulls into the parking lot, where the cruiser is stopped.  Lights from at least two other cruisers can be seen flashing.  The cruiser parks, with the camera and dash facing parked cars away from the scene of the arrest.  No individuals are within view.  At 3:00:05, the feed cuts to a gray fuzzy screen, then a plain gray screen, for mere seconds.  The feed resumes to a feed of the cruiser dash camera looking at the same scene at 3:06:17 on the scene.  We see an officer in front of a car with a flashlight around 03:07:09 and then a police cruiser pulls into the parking lot around 03:10:08 followed by an officer emerging from the car.  At 03:18:26, the car starts to move and the feed cuts to a gray fuzzy screen, then a gray screen.  The entire segment lasts about 21 minutes.

---

[2] It is unclear to the Court, based upon a review of the Trial Transcript, whether the video played at trial included a blue screen six seconds after 3:00 a.m. and the blue screen lasted for a period of six minutes.  The video was played for six minutes at trial, but beyond that the record is unclear on that point.  (*See id*. at PageID 722–27.)

Gray was acquitted of the charges brought by Deputy Hatfield. At jury trial, Gray was convicted of improper handling a firearm in a motor vehicle in violation of Ohio Rev. Code § 2923.16(E)(1) for failure to promptly inform a law enforcement officer of his handgun, a charge that was added by the prosecutor's office while the case was at the grand jury. (Doc. 33-3 at PageID 750.)

### 3. Investigation Regarding Deputy Hatfield

In June of 2015, Butler County Prosecutor, Mike Gmoser, raised concerns with Sheriff Jones about whether Deputy Hatfield conducts impermissible and pretextual searches and overcharges individuals to acquire overtime hours from court proceedings. (Doc. 1-4 at PageID 24–25.) In response, Sheriff Jones and Chief Deputy Anthony Dwyer tasked the detective division of their office with investigating the concerns raised by Prosecutor Gmoser. (Dwyer Dep., Doc. 32-8 at PageID 543.)

The investigation conducted by the Sheriff's office looked at Deputy Hatfield's arrests beginning the day after the incident with Gray. (*Id.* at 566.) During the course of the investigation, no one did any statistical analysis of Deputy Hatfield's charging habits as compared with other officers. (*Id.* at 571; Jones Dep., Doc. 32-5 at PageID 499.) The investigation confirmed concerns with Deputy Hatfield's conduct, referring to his use of overtime as "extraordinary." (Doc. 32-7.) However, it did not find anything to support criminal allegations and determined that those allegations were unsubstantiated. (*Id.*) The investigation noted that it "appears that there is a widely held belief that Deputy Hatfield does not like to plead out cases and files charges that 'most officers' would not file in order to obtain court overtime; however, nobody we have spoken to can provide us with any evidence to support this belief." (*Id.* at 526.) Deputy Hatfield's supervisors were purportedly instructed to monitor his criminal

charges going forward. (*Id*. at 524.) However, Corporal Brockman, Deputy Hatfield's direct supervisor, testified that he was never instructed to monitor the tickets Deputy Hatfield was writing. (Doc. 32-4 at PageID 430, 445–46.) Moreover, Chief Deputy Dwyer and Sheriff Jones were unable to identify anyone responsible for monitoring Deputy Hatfield's charging habits following the conclusion of the investigation. (Jones Dep., Doc. 32-5 at PageID 494; Dwyer Dep., Doc. 32-8 at PageID 572.) Chief Deputy Dwyer met with Deputy Hatfield to address concerns and counsel Deputy Hatfield on issues involving the case that precipitated Prosecutor Gmoser's letter.

## C. Procedural History

Plaintiff initiated this civil action on October 12, 2016 by filing a Complaint against Deputy Hatfield, Corporal Brockman and Butler County Sheriff Richard K. Jones, as well as John Does 1-10 of the Butler County Sheriff's Department. (Doc. 1.) In his Complaint, Plaintiff asserts the following causes of action:

Count 1: Unlawful seizure, arrest, and detention by Deputy Hatfield in violation of 42 U.S.C. § 1983;
Count 2: Supervisory liability by Sheriff Jones in violation of 42 U.S.C. § 1983;
Count 3: Failure to train by Sheriff Jones in violation of 42 U.S.C. § 1983;
Count 4: Inadequate supervision by Sheriff Jones and Does 1-10 in violation of 42 U.S.C. § 1983;
Count 5: Ratification by Sheriff Jones in violation of 42 U.S.C. § 1983;
Count 6: False arrest by Deputy Hatfield in violation of 42 U.S.C. § 1983;
Count 7: Spoliation of evidence by all Defendants; and
Count 8: Intentional infliction of emotional distress.

On March 15, 2018, Defendants filed a Motion for Summary Judgment (Doc. 36) as to all claims. Plaintiff responded in opposition, but conceded summary judgment on Counts 2, 3, 4, and 6. (Doc. 39 at PageID 1312.) For the reasons that follow, material disputes of fact preclude summary judgment on Counts 1 and 5 and the Motion will be **DENIED** as to those claims. As to Count 7, summary judgment will be **GRANTED** with respect to Sheriff Jones and **DENIED**

with respect to Corporal Brockman and Deputy Hatfield.  Finally, summary judgment for Defendants will be **GRANTED** as to Count 8 and conceded Counts 2, 3, 4, and 5.

## II.     SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden of showing that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 585–87; *Provenzano*, 663 F.3d at 811.

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

# III.    ANALYSIS

## A.    Fourth Amendment Claims

Gray asserts a claim of unlawful seizure, arrest, and detention in violation of 42 U.S.C. §

1983 against Deputy Hatfield.  He claims that both the initial stop of his car and subsequent

arrest violate his right to be free from unreasonable searches and seizures.  Section 1983 creates

a cause of action to remedy constitutional violations as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or causes to be subjected, any citizen of the
> United States . . . to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To prevail on a claim under 42 U.S.C. § 1983, Plaintiff must prove that "(1) a

person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right."  *Berger v.*

*City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001).

Deputy Hatfield raises the defense of qualified immunity, which "shields government

officials from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Harmon v. Hamilton Cty.*, 675 F. App'x 532, 536-37 (6th Cir. 2017) (internal quotations and

citations removed).  "The plaintiff carries the burden of proof to show that the defendant is not

entitled to qualified immunity."  *Id.* at 537.  "In determining whether a law enforcement officer

is shielded from civil liability due to qualified immunity, this court typically employs a two-step

analysis: '(1) whether, considering the allegations in a light most favorable to the party injured, a

constitutional right has been violated, and (2) whether that right was clearly established.'"  *Id.*

*(quoting Smoak v. Hall,* 460 F.3d 768, 777 (6th Cir. 2006).)  "These questions may be answered

in either order." *Id*. If the answer to either one is "[no] then qualified immunity protects the officer from civil damages." *Id.*

### 1. Traffic Stop

The Court will first consider whether Deputy Hatfield is protected by qualified immunity for the initial traffic stop. "A person who has been the victim of an unlawful arrest or wrongful seizure under the color of law has a claim based on the Fourth Amendment guarantee that government officials may not subject citizens to searches or seizures without proper authorization." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009) (citing U.S. Const. amend. IV). The Fourth Amendment requires that a traffic stop "not be 'unreasonable' under the circumstances." *Whren v. U.S.*, 517 U.S. 806, 810 (1996). However, the constitutional reasonableness of a traffic stop under the Fourth Amendment does not depend upon the "actual motivations of the individual officers involved." *Id.* at 813. A police officer may stop a car with probable cause to believe a civil traffic infraction has occurred or with reasonable suspicion of ongoing criminal activity. *U.S. v. Blair*, 524 F.3d 740, 748, 750 (6th Cir. 2008).

Under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may stop a vehicle based on reasonable suspicion of an ongoing crime. A *Terry* stop "must be supported by specific and articulable facts that would 'warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *Blair*, 524 F.3d at 750 (citing *Terry*, 392 U.S. at 21–22).) In other words, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).) "Additionally, the stop must be justified at its inception, and it must be reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. The

Court must consider the totality of the circumstances to determine the validity of a *Terry* stop. *Id.*

Deputy Hatfield argues that the undisputed facts demonstrate that he had reasonable suspicion that Gray was driving while intoxicated, justifying the stop. In support of his position, he cites the following: it was 2:50 a.m., Gray was driving within close proximity to a bar, he witnessed Gray make a "wide" turn, fail to maintain his lane of travel, and weave from lane mark to lane mark. Although acknowledging that weaving alone would not support reasonable suspicion, he claims that all of these factors together give rise to reasonable suspicion of an intoxicated driver under Ohio law. *See Green v. Thockmorton*, 681 F.3d 853, 864 (6th Cir. 2012) (question of fact as to whether officer had reasonable suspicion driver was driving under the influence prior to administering field sobriety tests and finding that traffic violations alone are relevant to the totality-of-the-circumstances inquiry but not dispositive of driver impairment).

In response, Plaintiff raises both disputes of fact and issues of credibility. He disputes that he failed to maintain his lane of travel or weaved from lane mark to lane mark. He contends that if he were weaving, the exterior of his tires would be damaged from the places in the road in which there was a median. He also calls into question the credibility of Deputy Hatfield, citing discrepancies in his Narrative Report of the incident. The Narrative Report leaves out any indication that he was weaving or having trouble maintaining his lane. Rather, it states that Deputy Hatfield observed Plaintiff make "an improper U-turn in the roadway in front of me" and that he had to "apply my brakes to keep from hitting the vehicle and once behind the vehicle I activated my overhead lights in the area of the Columbia Bridge." (Doc. 1-1 at PageID 20.) Deputy Hatfield was trained to prepare a Narrative Report with all relevant facts, yet seemingly

omitted important details about what he observed the early morning of December 12, 2014.[3]
(*See* Doc. 33-2 at PageID 660 (Hatfield testimony).)

Based upon these factual discrepancies and credibility issues, the Court cannot determine whether Plaintiff was weaving or committing lane violations during the time shortly before he was pulled over. If Plaintiff's version of events were believed, a reasonable jury could determine that Deputy Hatfield lacked reasonable suspicion that Gray was driving under the influence of alcohol. As such, the Court cannot conclude that Deputy Hatfield is entitled to qualified immunity at this time.

## 2. Arrest

Next, the Court will consider whether Deputy Hatfield had probable cause to arrest the Plaintiff for driving under the influence of alcohol.[4] However, as resolution of this question turns on disputed testimony, the question is properly determined by a jury. "[P]robable cause for an arrest . . . depends on whether, at the moment the arrest was made, . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014) (citing *U.S. v. Harness,* 453 F.3d 752, 754 (6th Cir. 2006)) (internal quotations removed). Whether probable cause exists is a difficult, fact-specific determination:

---

[3] The Court limited its discussion of its concerns about Deputy Hatfield's credibility to only facts regarding reasonable suspicion but notes that there are other credibility issues which will be addressed *infra*.
[4] Deputy Hatfield alternatively argues in a one-sentence footnote that he had probable cause to arrest Plaintiff for improper handling of a firearm in violation of Ohio Rev. Code § 2923.16(D)(1), which prohibits knowingly transporting or having a loaded handgun in a motor vehicle, if at the time of that transportation or possession, that person is under the influence of alcohol, a drug of abuse, or a combination of them. Deputy Hatfield stated in his Narrative Report that a .40 caliber Glock handgun was found with one bullet in the chamber in the rear of the vehicle where the driver was reaching and a full magazine in the floorboard. (Doc. 1-1 at PageID 20.) Because there is a question of fact as to whether Plaintiff was under the influence of alcohol that evening, the Court cannot determine whether Deputy Hatfield had probable cause to arrest Plaintiff for violation of possessing a firearm while under the influence of drugs or alcohol in violation of Ohio Rev. Code § 2923.16(D)(1). That is a question for the jury.

> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. *See [Illinois v. Gates,* 462 U.S. 213, 232, 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983) ]; *Brinegar [v. United States,* 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949) ]. We have stated, however, that "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt," *ibid.* (internal quotation marks and citations omitted), and that the belief of guilt must be particularized with respect to the person to be searched or seized, *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S. Ct. 338, 62 L.Ed.2d 238 (1979). *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S. Ct. 795, 157 L.Ed.2d 769 (2003). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor,* 60 F.3d 1211, 1215 (6th Cir. 1995).

*Kinlin*, 749 F.3d at 577–78. An officer may have probable cause to arrest when, under the totality of the circumstances, the undisputed facts show the driver made an unsafe lane change, smelled of alcohol, admitted to consuming alcohol, and thrice refused a field sobriety test. *Id.* at 579-80.[5]

The testimony in this case is contradictory. To highlight a few of those discrepancies, Plaintiff testified that he had three bourbon drinks at a work function the early evening prior to December 12, but nothing to drink thereafter or in the morning of December 12. He claims he interacted with Deputy Hatfield only briefly, did not slur his speech, and never was asked for his identification. In contrast, Deputy Hatfield testified he smelled alcohol and observed Gray's glassy, bloodshot eyes, and mumbled speech upon initially speaking with Gray. After restraining Ebbing, Deputy Hatfield had a conversation with Gray while he was detained in the back of Corporal Brockman's cruiser. He claims Gray smelled of alcohol, slurred his speech, had glassy, bloodshot eyes, and admitted to consuming "five or six drinks." This, he claims, gave him ample probable cause to arrest Gray for driving under the influence of alcohol in violation of Ohio law.[6]

---

[5] The exclusionary rule does not apply to civil § 1983 cases; thus, even if the Court determines the initial traffic stop was unconstitutional, there is no basis upon which to exclude the evidence of what occurred after in considering whether there was probable cause to arrest Gray. *Turk v. Comerford*, 488 Fed. App'x 933, 944 (6th Cir. 2012).

[6] In his Motion for Summary Judgment, Deputy Hatfield argues that Plaintiff's refusal of a breathalyzer should be considered in the Court's probable cause analysis. See *Bailey v. City of Howell*, 643 Fed. App'x 589, 595–96 (6th Cir. 2016) (officer had probable cause to arrest for drunk driving where undisputed facts established officer observed the driver leave a club at two o'clock in the morning, observed careless driving, watery, blood-shot eyes,

The Court finds it concerning that the alleged conversation between Deputy Hatfield and Gray in the back of Corporal Brockman's cruiser may or may not have occurred, depending upon which witness one believes. Such a conversation may have been recorded by Corporal Brockman's police cruiser camera – that footage, however, is strangely absent from the cruiser cam (and the subject of the spoliation charge) and lacks full audio. Plaintiff also argues that the sequence of events as described by Deputy Hatfield cannot be plausible within the corresponding timeframe, an argument he supports with expert testimony by Jack Holland.[7] The Court does not need to refer to an expert opinion testimony, however, as the sequence of events plainly conflict with the sequence of events as Plaintiff testified.

There are also significant issues with Deputy Hatfield's credibility. Deputy Hatfield's Narrative Report describes a different version of events than what both he and other witnesses testify; for example, he claims he observed Gray make an illegal U-turn, smelled a "very strong odor of alcohol *and marijuana* emitting from the vehicle," and observed "furtive movements" by the passenger and driver prior to pulling them over. (Doc. 1-1 at PageID 20) (emphasis added). Deputy Hatfield did not include the odor of marijuana in his subsequent descriptions of what he observed. (*See* Doc. 33-2.) In his Narrative Report, Deputy Hatfield claimed that Gray admitted to drinking "six or seven beers" prior to being stopped. (*Id*. at PageID 21.) However, the alleged admission has varied; for example, at the criminal trial, Deputy Hatfield testified that Gray admitted to having "five or six drinks." (Doc. 33-2 at PageID 650 (Hatfield testimony).) In

---

and heard the driver say he had recently consumed alcohol, refused a breath test, and smelled of intoxicants.) In *Bailey*, the driver was offered a breath test prior to being arrested. *Id*. at 592. In this case, Deputy Hatfield did not give Gray the opportunity to take a breath test, or any other field sobriety test, prior to being arrested. Thus, this argument is not dispositive.

[7] Plaintiff relies upon Mr. Holland's expert report and testimony but has neglected to provide the C.V. of Mr. Holland to the Court such that the Court can assess Mr. Holland's experience and credentials in assessing whether he is qualified to testify as an opinion witness. The Court, therefore, does not rely upon this report in making its determination.

addition, Deputy Hatfield describes the gun that was retrieved from Gray's vehicle as being loaded; however, Deputy Brown, who recovered the weapon, refutes this fact. (*Id.* at PageID 694, 696 (Brown testimony).)

Significant factual questions and credibility issues abound which preclude a holding that Deputy Hatfield is entitled to qualified immunity on the unlawful arrest claim. If believed, Plaintiff's testimony would establish that Deputy Hatfield lacked probable cause to arrest him for driving under the influence of alcohol. As such, the Court will deny summary judgment to Deputy Hatfield.

## B.    Ratification

Gray alleges that Sheriff Jones ratified Deputy Hatfield's actions by allowing his criminal case to go forward in state court despite being on notice of concerns regarding Deputy Hatfield's conduct from Prosecutor Gmoser. A municipality is not liable for the conduct of its non-policy making employees who act contrary to the policies of the municipality. *Turner v. City of Taylor,* 412 F.3d 629, 639 (6th Cir. 2005). A municipality may be liable for the unconstitutional decision of its policymaking employees, however, if it ratifies those decisions. *City of St. Louis v. Prapotnik,* 485 U.S. 112, 127 (1988). Ratification can occur when a policymaker fails meaningfully to investigate the acts of the officer.[8] *Williamson v. Scioto Twp. Trustees*, No. 2:13-CV-683, 2014 WL 4388266, at *13 (S.D. Ohio Sept. 5, 2014). Failing meaningfully to investigate may include the lack of any investigation or an investigation that is not designed to uncover what actually happened. *Id.*

---

[8] Ratification also occurs when an individual with policymaking authority issues a final decision affirming a subordinate's decision on the merits and adopts it as municipal policy. *Id.* However, there has been no evidence or argument under this theory of ratification in this case.

Plaintiff argues that Sheriff Jones was on notice of issues with Deputy Hatfield overcharging individuals as of the date of Prosecutor Gmoser's July 2015 letter. Plaintiff argues that investigation was not designed to obtain meaningful results, as the investigation reviewed arrests beginning the day *after* his arrest and included no statistical analysis or comparison of Deputy Hatfield's charging habits. During the course of the investigation, Sheriff Jones's officers noted a widely-held belief that Deputy Hatfield overcharges suspects. At the conclusion of the investigation, supervisors were instructed to supervise and monitor Deputy Hatfield; however, no meaningful supervision has actually been performed by any supervisors, including Corporal Brockman, Chief Dwyer, and Sheriff Jones.

Defendant responds that Prosecutor Gmoser's letter did not involve the arrest of Gray on December 12, 2014, nor did it involve Gray's subsequent criminal prosecution. In any event, the Sheriff's Office investigated the allegations of overcharging and those claims were unsubstantiated. Chief Dwyer met with Deputy Hatfield to discuss charging concerns in a specific case and counseled him regarding the matter.

The Court finds that whether the Sheriff's office conducted a "meaningful investigation" into Deputy Hatfield's conduct is a question for the jury. Although the letter that put the Sheriff on notice did not specifically mention Gray, the subject matter of the concerns—overcharging suspects to obtain overtime—is certainly applicable here, where Plaintiff asserts he was improperly charged. Plaintiff has offered evidence that the timing and method of the investigation may not have been designed to produce meaningful results. If the jury were to conclude that no meaningful investigation was conducted, it could also conclude that had one been conducted, the state court prosecution of Gray may not have gone forward. The jury, not the Court, must make this determination. Summary judgment on this claim, therefore, is denied.

**C.     Intentional Infliction of Emotional Distress**

Defendants argue they are entitled to summary judgment on Plaintiff's intentional

infliction of emotional distress claim because there is no evidence of extreme and outrageous

conduct or that Plaintiff suffered from severe mental anguish.  Under Ohio law, a claim of

intentional infliction of emotional distress requires a plaintiff to prove:

> (1) that the actor intended to cause emotional distress or knew or should have
> known that his actions would result in serious emotional distress to the plaintiff;
> (2) that the conduct complained of has been so outrageous in character and
> extreme in degree as to go beyond all bounds of decency; (3) that the conduct
> proximately caused the plaintiff's injury; and (4) that the mental anguish suffered
> by the plaintiff is serious and of a nature that no reasonable person could be
> expected to endure it.

*Day v. Nat'l Elec. Contractors Ass'n*, 82 F. Supp. 3d 704, 709 (S.D. Ohio 2014) (citing *Ashcroft*

*v. Mt. Sinai Medical Ctr.,* 68 Ohio App.3d 359, 588 N.E.2d 280, 284 (1990).)

Plaintiff argues in conclusory fashion that the alleged violation of his constitutional rights

exceeds the bounds of decency and is utterly intolerable.  He broadly cites two pages of his

Answers to Interrogatories, in which he states that he has suffered from anxiety, depression,

isolation, stress, a loss of sleep, loss of self-confidence, lack of focus, anger, and emotional

distress, resulting in his demotion at work, and that he has not seen a physician to address these

issues.  (Doc. 33-1 at PageID 612, 614.)  Plaintiff's conclusory allegations are insufficient

evidence to support his claim.

"While Ohio does not require expert medical testimony to support an intentional

infliction of emotional distress claim, a plaintiff must at least provide some evidence beyond his

or her own testimony."  *Talley v. Family Dollar Stores of Ohio, Inc*., 542 F.3d 1099, 1111 (6th

Cir. 2008) (citing *Buckman-Peirson v. Brannon,* 159 Ohio App.3d 12, 822 N.E.2d 830, 841

(2004).)  *See also Daniels v. City of Wyoming*, No. 1:15-CV-507, 2016 WL 524356, at *7 (S.D.

Ohio Feb. 10, 2016) (bare allegations that plaintiff suffered from mental anguish are not sufficient to support that alleged emotional anguish was severe and debilitating). As in *Talley*, Plaintiff's own assertions do not provide evidence of serious emotional distress.[9] The claim is appropriately dismissed.

## D.     Spoliation

Plaintiff claims that Defendants altered cruiser camera footage from Corporal Brockman's vehicle, which amounts to spoliation.[10] The video could have included potentially exculpatory evidence, or at the very least, evidence that proves or disproves whether Deputy Hatfield had a conversation with Plaintiff while Plaintiff was held in the back of Corporal Brockman's cruiser. There are several issues with the video: the video includes a gray screen in the middle that seems to be missing approximately six minutes, the audio is turned down, and Plaintiff argues that the video currently in evidence may be different than the one presented in the state court trial.

A claim for spoliation under Ohio law, an intentional tort, requires proof of five elements: (1) pending or probable litigation involving the plaintiff; (2) knowledge on the part of the defendant that the litigation exists or is probable; (3) willful destruction of the evidence by the defendant designed to disrupt the plaintiff's case; (4) disruption of the plaintiff's case; and (5) damages proximately caused by the defendant's actions. *Gliatta v. Tectum, Inc.*, 211 F. Supp. 2d 992, 1011 (S.D. Ohio 2002). There is no dispute that Deputy Hatfield and Corporal Brockman, who participated in the arrest of Plaintiff and responded to the scene, were aware of criminal

---

[9] Because this is dispositive, the Court will not address the Defendants' argument that the alleged conduct does not arise to "extreme and outrageous" conduct under the law.

[10] Although the Court will find that the spoliation charge against Deputy Hatfield and Corporal Brockman may proceed, the record lacks evidence of Sheriff Jones intentionally destroying evidence in this case. Summary judgment for him on this record is therefore appropriate.

charges against the Plaintiff and had knowledge that those charges would involve litigation. The issue is whether there was willful destruction of evidence.

The Court is troubled by the record in this case concerning Corporal Brockman's dash camera video. The Court has observed that there is a seeming lapse in time in the middle of the video from 3:00:05, when the feed cuts to a gray fuzzy screen, then a plain gray screen for a couple of seconds, then resumes at 3:06:17 on the scene. There seems to be no explanation for this. In addition, despite Corporal Brockman testifying that he forgot to turn on audio the day of the incident, the Court has observed audio in the background of the video, most notably at 2:56:04 and 2:56:26 a.m.

Plaintiff also argues that at trial, the blank, blue screen in the video dash camera feed appeared for over six minutes and then cuts to Corporal Brockman's cruiser driving away at 3:06 a.m. Plaintiff contends that the video now in evidence with this Court is different than the video presented at trial. Based on a comparison of the trial transcript to the Court's own observations, the Court agrees there are seeming differences, enough so that a question of fact exists. At trial, Corporal Brockman testified that at 03:00, about six seconds after 3 a.m., he saw a "blue screen." (Doc. 33-3 at PageID 726.) There is no blue screen in the video now in evidence at 03:00:06. The video in evidence shows approximately twenty minutes of footage from that morning, and at 3:00:05 on the video clock, the feed cuts to a fuzzy gray screen followed by a plain gray screen, then the feed returns at 3:06:17 on the video clock.

The content of the video and late disclosure of the video raise issues of willfulness. The video's existence was revealed at the criminal trial on this matter by Deputy Hatfield in direct contradiction to prior testimony by Deputy Hatfield. Further, Corporal Brockman testified that he forgot to record sound, but the Court could observe some sound on the video feed.

In moving for summary judgment, Defendants argue that Corporal Brockman's cruiser video was not altered in any way.[11]  As has been noted, there is evidence to the contrary which precludes summary judgment.  However, the Court will briefly address the evidence brought forward by Defendants.  Defendants broadly cite to a letter from Prosecutor Gmoser with various attachments, a lengthy investigation file from the Butler County Sheriff's Office regarding the video, and the video itself.  (*See* Doc. 36 at PageID 919.)   In moving for summary judgment, the Defendant must identify specific evidence to support its position that there is no dispute of material fact.  The Court has no obligation to sift through nearly one-hundred pages to find Defendants' supporting evidence.  *See Emerson v. Novartis Pharms. Corp.,* 446 F. App'x 733, 735–36 (colorfully recognizing that district judges are not required to track down facts and arguments not presented by the parties because judges are not "like pigs, hunting for truffles").

Regardless, the documents cited by Defendants lead to more questions than answers. Defendants rely upon an in-house assessment by Prosecutor Gmoser and the Systems Administrator and Technical Advisor for the Butler County Prosecutor's Office, Brad Schafer, for the conclusion that the video was not altered.  Prosecutor Gmoser states that he reviewed the tape from start to finish and listened to the audio.  He notes that the VHS tape is old technology and that his "technician tells me that VHS is nearly impossible to corrupt without leaving a trace unless extreme measures are taken to cut and splice the tape for which there is no evidence." (Doc. 35-2 at PageID 804.)  He explains that the recording device has three measurements on the tape that cannot be altered and that the six minutes did not result from that period of time being erased.  (*Id*.)  Although it did not take a "rocket scientist" to determine the tape was not

---

[11] Defendants also argue Plaintiff admits Corporal Brockman did not record evidence of Plaintiff's arrest in response to his Proposed Undisputed Facts.  In viewing the video, the Court interprets this to mean the video did not record the actual incident of the arrest, because the camera is facing away from the scene.  The video speaks for itself.

adulterated, Prosecutor Gmoser asked his technician to review whether the absence of audio could be accounted for by adulteration and "his expert opinion is that no audio alteration or adulteration took place concerning the tape." (*Id.* at 805.) He understands that "Brockman was under the mistaken belief that audio would be recorded when he activated his overhead lights which actually required another switch to activate…" (*Id.*) He attaches a summary of Mr. Schafer's conclusions. (*Id.* at 806–07.)

The Court is without sufficient information to evaluate Prosecutor Gmoser's and Mr. Schafer's conclusions that the dash camera video was not altered. They are seemingly offered as expert testimony, but the Court has not been provided with Curricula Vitae of either nor have Defendants moved to qualify an opinion witness. In addition, both Prosecutor Gmoser and Mr. Schafer make credibility assessments of the Corporal, but those credibility issues are appropriately resolved by a jury. Thus, the Court will not treat these individuals as opinion witnesses and does not afford their conclusions much weight.

In its own review of the video and trial transcript, the Court is left with serious questions about the facts underpinning Corporal Brockman's dash camera video. The Court finds there is evidence, that if believed by a jury, could support evidence of spoliation. These factual matters must be resolved by a jury.

**E.      State Law Immunity**

Defendants raise the defense of state law immunity under Ohio Rev. Code § 2744.03(A)(6), which states that political subdivision employees are entitled to immunity when their activities concern governmental or proprietary functions, except where they act with a "malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.* § 2744.03(A)(6)(b). As set forth in *Gill v. Kovach*, 729 F. Supp. 2d 925, 943–44 (N.D. Ohio 2010):

Malice is "that state of mind under which a person's conduct is characterized by hatred, ill will or spirit of revenge" or "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty,* 32 Ohio St.3d 334, 336, 512 N.E.2d 1174 (1987). Bad faith is "a dishonest purpose, conscious wrongdoing or breach of a known duty by some ulterior motive or ill will characterized by fraud." *Kalain v. Smith,* 25 Ohio St.3d 157, 159 n. 1, 495 N.E.2d 572 (1986). Wanton conduct is the failure to exercise any care whatsoever toward one to whom a duty of care is owed under the circumstances in which there is a great probability of resulting harm. *Hawkins v. Ivy,* 50 Ohio St.2d 114, 117–18, 363 N.E.2d 367 (1977). An act is committed recklessly if it is done "with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than necessary to make the conduct negligent." *Caruso v. State,* 136 Ohio App.3d 616, 621, 737 N.E.2d 563 (Ohio App. Ct. 2000).

There exists a presumption of immunity for officers engaging in official duties. *Knox v. Hetrick,* No. 91102, 2009 WL 792357, *3 (Ohio App. Ct. Mar. 26, 2009). A plaintiff must produce sufficient evidence to rebut the presumption of immunity. *Cook v. City of Cincinnati,* 103 Ohio App.3d 80, 91, 658 N.E.2d 814 (1995).

The only potential remaining claim for state law immunity is the spoliation claim. The Court finds that there are material issues of fact surrounding the video itself that preclude a finding of statutory immunity under Ohio law. If Plaintiff's version of events is believed, there is evidence that Deputy Hatfield and Corporal Brockman acted with wanton or reckless behavior, as evidenced by Deputy Hatfield's testimony refuting the existence of a dash camera video prior to the criminal trial in this case. There is evidence of Corporal Brockman's wanton behavior in failing to disclose the dash camera video and storing it in his basement, and subsequently revealing the existence to Deputy Hatfield prior to alerting the Court. There is also testimony about the dash camera video lacking audio, when the Court can hear audio in the background. However, the factual underpinnings of whether the video footage was altered must be presented to, and decided by, a jury. *See Family Service Ass. of Steubenville v. Wells Township*, No. 2:12-cv-135, 2014 WL 11516089, at *10 (S.D. Ohio 2014) (granting summary judgment on spoliation claim for city and chief but denying immunity on spoliation claim for police officer where there

was evidence from which a jury could infer that the officer's conduct in destroying notes was wanton and reckless). Thus, the Court cannot conclude that either Deputy Hatfield or Corporal Brockman is entitled to statutory immunity at this time. That question is for the jury.

## IV.    CONCLUSION

The Court, having reviewed the parties' pleadings and in accordance with the reasons stated herein, **DENIES** Defendants' Motion for Summary Judgment as to the Fourth Amendment and ratification claim, and **GRANTS** the motion as to the supervisory liability, failure to train, inadequate supervision, false arrest, and intentional infliction of emotional distress claims. The Court **GRANTS** summary judgment to Sheriff Jones on the spoliation claim, but **DENIES** summary judgment to Deputy Hatfield and Corporal Brockman on the spoliation claim.

**IT IS SO ORDERED.**


S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court